13221

STATE v. GRAHAM

(159 S. E., 838)

364

*Messrs. Sherwood & McMillan,* for appellant,

*Mr. L. M. Gasque, Solicitor,* for the State.

August 7, 1931.

The opinion of the Court was delivered by MR. JUSTICE CARTER.

Under an indictment charging him with the murder of one Sam Singleton, in the county of Horry, May 24, 1930, the defendant, Luther Graham, was tried in the Court of General Sessions for said county before his Honor, Judge S. W. G. Shipp, and a jury, June 6, 1930; the trial resulting in a verdict of guilty, without recommendation to the mercy of the Court. The defendant's motion for a new trial being refused from sentence of death by electrocution the defendant has appealed to this Court.

In passing upon the appeal we shall not consider the exceptions separately, but shall adopt the plan so well outlined by appellant's counsel and pass upon the questions raised by the exceptions in the order presented by counsel. However, we shall first give a brief statement of the facts leading up to the fatal tragedy. The defendant married the sister of the deceased and during the greater part of the defendant's married life resided near or with his wife's relatives. The

families did not get along so well and there were often unpleasant occurrences. The feeling between the defendant and the deceased was bad, and on the morning before the killing of the deceased, the night of May 24th, the defendant had unpleasantness with his wife. During that day a number of things took place which indicated that the parties, the defendant on one side and his wife's people on the other, were expecting trouble and were making preparations accordingly. About night the relatives of the wife gathered at the home of the deceased, and among the number were the defendant's wife and his three children. Some of the deceased's brothers had guns, or at least there were two or three guns there. Some time after dark, while they were sitting around the supper table, eating the evening meal, the defendant fired from the outside of the house through a window screen, killing the deceased, and immediately thereafter fired into another room, striking his wife and seriously wounding her. The defendant had approached the house of the deceased under cover of darkness without the knowledge of any one present. Later during the night he went to the county seat, where he surrendered to officers of the law and afterwards admitted that he did the shooting.

### QUESTIONS RAISED BY EXCEPTIONS

1. "Was there error in forcing the defendant to trial at the June term of the Court of General Sessions for Horry County without having had opportunity to confer with counsel with any deliberation and at a time when public opinion was at white heat against him?"

In our opinion the exception raising this question is based upon an erroneous position. While the trial took place a short time after the killing, about twelve days, as we view the record before us, the defendant was afforded not only reasonable but ample opportunity to confer with counsel, and the trial was conducted in a judicial atmosphere. There was no feeling manifested against the defendant and there was no more interest manifested in the trial than might reason-

ably be expected in the trial of any important murder case. In overruling defendant's motion for a continuance, the trial Judge made the following statement:

"The Court: I wouldn't feel warranted in continuing the case on those grounds. I couldn't change the venue on a mere statement. I don't know of any rule whereby a person should be granted a continuance because he may be charged with a crime of recent commission. The truth of it is the Constitution of the State has a provision in it that a man shall be entitled to a speedy trial—not a long delayed one. If there are any facts before me by which you know of witnesses and have not been able to get them, the Court will give you every process the Court is able to give in order to get the witnesses here. On that statement I could not continue the case.

"Mr. McMillan: We could not say there are witnesses we should have here, because we have been unable to get the facts.

"The Court: I couldn't grant a continuance unless you should bring yourself within the rule relating to continuances. I am sure you have been very honest about it and very frank about it. I have endeavored as far as I could to give you an opportunity to consult with your client and have done what I could to help you. You have a right to have the jurors put on their *voir dire* to see that you get an unbiased jury. So I'll order the case on for trial."

The language used by the trial Judge in passing upon the motion is proof of itself of his Honor's earnest desire and purpose to give to the defendant a fair and impartial trial and to afford him the full protection of the law, as well as to be fair to the State of South Carolina. In our opinion his Honor properly overruled appellant's motion for a continuance. The exception raising these questions must, therefore, be overruled.

2. "Was there error on the part of his Honor in passing as qualified two jurors, both of whom having stated that they had mental impressions in regard to the case on trial which would require evidence to remove

so that the defendant was compelled to exhaust his peremptory challenges while the jury panel was yet unfilled?"

In disposing of the exceptions raising this question, we quote from the transcript of record the following for the purpose of showing what transpired in the Court regarding the two jurors referred to by appellant:

"By the Court: Q. Are you related to the defendant, Luther Graham, or were you related to Sam Singleton, either by blood or marriage? A. No, sir.

"Q. Have you formed or expressed any opinion as to the guilt or innocence of the accused? A. Yes, sir; I have to a certain extent.

"Q. Something you have heard about the case? A. Yes, sir; I heard it discussed.

"Q. Do you feel that what you have heard might influence you if you went on the jury, or could you be governed by what you hear in the courthouse? A. I think I could be governed by what I hear in the courthouse.

"Q. You feel that you could discard everything you have heard about the case and try it entirely by the evidence you hear in Court? A. Yes, sir.

"Q. Are you conscious of any bias or prejudice in favor of, or against the accused? A. No, sir.

"State: Present him.

"Mr. McMillan: I believe you told the Court you had formed an opinion about this matter on account of what you had heard? A. Yes, sir.

"Q. What you heard was conversation and talk you heard since coming to Court? A. Yes, sir.

"Q. Around the streets and around the courthouse? A. Yes, sir.

"Q. Those conversations did make an impression on your mind? A. Yes, sir.

"Q. It would take evidence to remove that impression out of your mind, wouldn't it? A. Yes, sir.

"The Court: My idea about that is this: Most everybody

hears talk about cases. It is bound to make some sort of impression on their mind, but the test is whether a man feels he can discard what he has heard on the outside and try a case according to the evidence he hears in Court, discard what he hears on the outside and be governed entirely by what he hears in Court. I think he meets the test. It never would do to reject people because they read newspapers— that would never do, because they read newspapers. I don't think the law has meant anything of that sort. It means where a man gets an opinion and gets it so settled in his mind that he feels that it might influence him. If he swears that it wouldn't influence him, I couldn't reject him under a statement of that sort.

"Mr. McMillan: We ask permission to except to the ruling of this juror.

"The Court: All right, sir.

"Defense: We will excuse the juror.

"(26) T. B. Shelley, sworn as juror No. 10.

"(27) W. F. Jenkins.

"By the Court: Q. Are you related to the defendant Luther Graham, or were you related to Sam Singleton, either by blood or marriage? A. No, sir.

"Q. Have you formed or expressed any opinion as to the guilt or the innocence of the accused? A. In a way.

"Q. Was that opinion formed by something you heard or read about it? A. Papers.

"Q. Do you feel that you could, if selected on the jury, discard what you have heard on the outside and be governed entirely by the evidence in Court? A. Yes, sir.

"Q. Are you conscious of any bias or prejudice for or against the accused? A. No, sir.

"Q. Any conscientious scruples against inflicting death as punishment for crime? A. No, sir.

"Mr. McMillan: The conversations you have heard and what you have read in the newspapers has caused you to have an impression? A. Yes, sir.

"Q. It would take evidence to get that impression out of your mind? A. Yes, sir.

"Q. It would take evidence to remove that from your mind? A. Yes, sir.

"The Court: Do you feel that if you go on the jury, the law says a man is presumed to be innocent—do you feel that, notwithstanding anything you have heard on the outside, you could put it out of your mind entirely and presume this man is innocent and be governed entirely by the testimony you hear in the Court house? A. Yes, sir.

"State: Present him.

"Defense: Excuse the juror."

In our opinion the trial Judge committed no error in ruling that these jurors were competent to serve on the case. Exceptions charging error in this respect are, therefore, overruled.

3. "Was there error in permitting the witnesses, Dr. J. K. Stalvey and E. B. Singleton, to testify over defendant's objection in regard to the wounding of another person by the defendant after he had committed the alleged homicide?"

The testimony forming the basis for the exceptions raising this question was with regard to what the witnesses saw at the scene of the killing. They were permitted to testify, not only as to seeing the deceased at the scene in question after the shooting, but to testify also as to seeing Mrs. Graham in her wounded condition, caused by the defendant. The shooting of Mrs. Graham followed immediately after the shooting of the deceased, Sam Singleton; in fact, at the same time and in the same house. In our opinion it was proper to allow the witnesses to describe what they saw in this house when they arrived on the scene following the shooting, even to the extent of describing the condition of Mrs. Graham. These exceptions are, therefore, overruled.

4. "Was there error on the part of his Honor in refusing to permit defendant to testify in regard to former difficulties that had taken place between the deceased and himself?"

The defendant was permitted to state that former difficulties had taken place between himself and the deceased, but his Honor refused to allow the defendant to go into the details of such difficulties. The holding of his Honor was in keeping with the well-recognized rule of the Courts. The exception charging error in this respect is overruled.

5. "Did his Honor charge on the facts and misstate the law in charging the jury as follows:

" 'If the defendant here, Luther Graham, if he intentionally took the life of Sam Singleton, if he did that and he did it under circumstances that indicate that he had no legal right to take his life, then he would be guilty of murder.' "

6. "Did his Honor misstate the law in defining manslaughter and so limit the definition as to exclude consideration on the part of the jury as to cooling time?"

As the Court has often stated, a trial Judge cannot give a full statement of the law in one breath, and he is not expected to state it in one sentence. When the statements complained of are taken in connection with the balance of his Honor's charge (which will be incorporated in the report of the case), it will not only be seen that his Honor did not charge on the facts, but charged correctly every legal principle bearing on appellant's case. The errors charged cannot be sustained.

7. "Did his Honor commit error in refusing defendant's motion for a new trial on grounds stated in transcript and exceptions and briefly here.:

"(a) Error in permitting State's witnesses, Dr. J. K. Stalvey, E. B. Singleton, Robert Brown and Mrs. Horry Singleton, to relate facts relative to the shooting and wound-

ing of Mrs. Luther Graham, a person other than the deceased;

"(b) Because it was impossible for the defendant to have a fair and impartial trial on account of force of public opinion against him and the bringing by the prosecution of his wounded wife within the bar and seating her there in the presence of the jury and letting her remain there on exhibition during the trial of this case and while witnesses were testifying in regard to the nature and cause of her wounds by the defendant then on trial under a charge for another offense."

The reasons assigned by the trial Judge overruling the motion for a new trial, which we quote herewith, are satisfactory to this Court:

"The Court: My understanding of the law is that, although a person has expressed an opinion, when he comes up into Court and says that he feels that he can disregard anything he has heard on the outside and be governed by the sworn testimony in Court, that is sufficient. I don't suppose there is anybody in the world that reads a newspaper or reads an account of anything but what forms some sort of idea about it. It never would do to say that a man must be excluded from the jury because he has read a newspaper. I remember one case in Tennessee where they undertook to exclude everybody that ever read about it, and they had to get some six or seven hundred jurors before they finally got a set of jurors that never heard anything about the case. I think that rule has been gone long ago.

"About your second ground: I didn't allow any particulars to be gone into by the doctor as to the nature of her wounds. Whenever a transaction occurs, the jury that tries the case has a right to hear the whole transaction. If two people are shot about the same time, it is perfectly proper for that to come in. I don't think I made any error on that.

"On the third ground, Mr. McMillan, the Supreme Court has held that, when a man is on trial that he has a right to

have his wife in Court, and there have been cases after cases in this State continued on motion of the defendant because the wife couldn't come to Court, even in cases where she is not a witness, because they say he has a right to have his wife sitting by his side.

"Mr. McMillan: That is a right, the Supreme Court says, that belongs to the defendant, and I am sure the defendant did not make that exhibition here.

"The Court: The jury were out of here when she came in. They had gone in the room when she came into Court. She did not testify in the case, and I would have no power to have excluded her from the courthouse.

"Mr. McMillan: The Court will let its ruling state that she was actually brought in the bar and kept there?

"The Court: Yes, you can put in she came in accompanied by relatives or friends and took her seat in the bar. When that happened, at that time, the jury were out of the courtroom. I cannot give you a new trial on any of those grounds."

In our opinion the motion for a new trial was properly overruled.

In passing upon the appeal in this case, we wish to state that we are not unmindful of the seriousness of the case, but after giving careful consideration to every question the appellant has presented, and after making a close study of the entire record in the case, we are forced to the conclusion that all of the exceptions must be overruled.

It is therefore the judgment of this Court that the judgment of the lower Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES COTHRAN and STABLER and MR. ACTING ASSOCIATE JUSTICE, JOHN I. COSGROVE concur.